# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JENNIFER HAYES and JUSTIN HAYES, individually and as next friends of K.H., a minor child,<br><br>Plaintiffs,<br><br>v.<br><br>SMITHKLINE BEECHAM CORPORATION doing business as GlaxoSmithKline,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 07-CV-0682-CVE-TLW |

## OPINION AND ORDER

Now before the Court is defendant's motion for summary judgment (Dkt. # 512).  Defendant SmithKline Beecham Corporation[1] (GSK) seeks summary judgment on plaintiffs' claims for manufacturer's product liability, negligence, and punitive damages.[2]  GSK argues that it is entitled to summary judgment because: the testimony of plaintiffs' causation experts is inadmissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); plaintiffs' claims of failure to warn are preempted by federal law; and there is no evidence to support punitive damages or, in the

---

[1]   Defendant's name apparently has changed during the course of this litigation.  Defendant's motion is titled "Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline's Motion for Summary Judgment and Supporting Memorandum of Law."  Dkt. # 512.  However, the document refers to defendant as "GlaxoSmithKline LLC, formerly SmithKline Beecham Corp. d/b/a GlaxoSmithKline.  Id. at 9.  If defendant's name has changed, it is directed to file formal notice thereof with the Court.

[2]   Plaintiffs initially also asserted claims for breach of warranty and deceptive trade practices under the Oklahoma Consumer Protection Act.  In their response to GSK's motion for summary judgment (Dkt. ## 555, 565 (redacted copy)), they relinquished their breach of warranty and deceptive trade practices claims.  Dkt. # 555, at 30.

alternative, Oklahoma's punitive damages statute is unconstitutional.  Plaintiffs Jennifer Hayes and Justin Hayes (the Hayeses) dispute each of these arguments.

**I.**

The undisputed facts are as follows.  The Hayeses are the parents of K.H., a minor child who was born in December 2005 with a heart defect.[3]  Dkt. # 555, at 8.  Defendant is a corporation that designed, manufactured, and marketed the prescription pharmaceutical paroxetine hydrochloride, which is marketed and sold in the United States under the trade name "Paxil."  Dkt. # 6, at 2.  The Hayeses allege that Jennifer used Paxil during the first trimester of her pregnancy, and that Paxil caused K.H.'s heart defect.  See Dkt. ## 2; 555, at 8.  The Hayeses further allege that GSK knew or should have known of Paxil's alleged potential teratogenic[4] effects at the time Jennifer took Paxil.

In 1980, a foreign company that developed the compound granted GSK's predecessor an exclusive license to manufacture and sell Paxil.  Dkt. ## 565, at 8; 627, at 8.  Preclinical studies were conducted on rats and rabbits.[5]  See, e.g., Dkt. ## 555-16, 555-18.  Consistent with standard medical practice, Paxil was not tested in pregnant women.  Dkt. # 512, at 13.

---

[3]     The parties offer differing characterizations of K.H.'s heart defect.  GSK argues that K.H. was diagnosed with pulmonary artesia with an intact ventricular septum (PA-IVS).  The Hayeses do not dispute this statement.  Dkt. # 565, at 5-6.  However, the Hayeses state that K.H. was "born with a serious right ventricular outflow tract heart defect."  Id. at 8.  GSK argues that  "a 'right ventricular outflow tract heart defect' is not a diagnosis but rather a broad grouping of heart defects that do not predict whether a patient has PA-IVS."  Dkt. # 627, at 8.

[4]     The Hayeses define a "teratogen" as a substance that is "'associated' with" or "'causes' birth defects."  Dkt. # 2, at 3.

[5]     The parties disagree as to whether these preclinical studies revealed any potential for teratogenic effects.  They also disagree as to whether GSK conducted pre-approval studies.

2

GSK submitted a new drug application (NDA) for Paxil to the Food and Drug Administration (FDA) in 1989. Dkt. # 512-8, at 2. As part of the approval process, GSK submitted, and the FDA reviewed, the results of the rat and rabbit teratology studies. Dkt. # 512, at 14. The FDA reviewer determined that the submitted animal safety data "indicate that paroxetine should be reasonably safe for human use at the suggested dosage" and recommended approval of the new drug application. Dkt. ## 512-8, at 77; 555-25, at 78.

The FDA approved the NDA in December 1992. Dkt. ## 512-10, at 2; 555-24, at 2. In the approval letter, the FDA stated that "adequate information has been presented to demonstrate that the drug product is safe and effective for use as recommended in the draft labeling attached. Accordingly, the application, with these labeling revisions, is approved." Id. The letter also stated that specified labeling revisions "are the terms of the NDA approval. Marketing the product before making the agreed upon revisions in the product's labeling may render the product misbranded and an unapproved new drug." Id. The FDA reminded GSK that "should additional information relating to the safety and effectiveness of this drug product become available, further revision of the labeling may be required," and "you must comply with the requirements for an approved NDA as set forth under 21 CFR 314.80 and 314.81."[6] Dkt. ## 512-10, at 4; 555-24, at 4.

The final label stated that "patients should be advised to notify their physician if they become pregnant or intend to become pregnant during therapy." Dkt. ## 512-10, at 11; 555-24, at 11. The

---

[6]      These regulations require postmarketing reporting of adverse drug experiences, 21 C.F.R. § 314.80 (1992), and other postmarketing reports, 21 C.F.R. § 314.81 (1992).

label stated that Paxil was a Pregnancy Category B medication,[7] which meant that animal reproduction studies revealed no evidence of teratogenic effects, and that "there are no adequate and well-controlled studies in pregnant women." Id.

In 1995, an FDA pharmacology reviewer issued a memorandum that discussed changing the labeling for Paxil and other selective seratonin reuptake inhibitors (SSRIs) from Pregnancy Category B to Pregnancy Category C.  Dkt. # 556-2, at 4.  Certain SSRIs were already labeled Pregnancy Category C.  The memorandum stated that those drugs already labeled Pregnancy Category C were labeled "with strict adherence to [the pregnancy category labeling regulations]."  Dkt. # 556-2, at 4.  It also stated that certain data suggested that "the drugs [including Paxil] induce a developmental abnormality sufficient to kill some of the [rat] pups [studied]" but that "[p]reclinical teratogenic effects have not been noted with any of these drugs."  Id.

---

[7]    The FDA uses five labeling categories relating to teratogenicity and pregnancy:  Pregnancy Category A means that "adequate and well-controlled studies in pregnant women have failed to demonstrate a risk to the fetus in the first trimester of pregnancy;" Pregnancy Category B means that "animal reproduction studies have failed to demonstrate a risk to the fetus and there are no adequate and well-controlled studies in pregnant women" or "animal reproduction studies have shown an adverse effect (other than decrease in fertility), but adequate and well-controlled studies in pregnant women have failed to demonstrate a risk to the fetus during the first trimester of pregnancy;" Pregnancy Category C means that "animal reproduction studies have shown an adverse effect on the fetus, if there are no adequate and well-controlled studies in humans, and if the benefits from the use of the drug in pregnant women may be acceptable despite its potential risks" or "there are no animal reproduction studies and no adequate and well-controlled studies in humans;" Pregnancy Category D means that "there is positive evidence of human fetal risk based on adverse reaction data from investigational or marketing experience or studies in humans, but the potential benefits from the use of the drug in pregnant women may be acceptable despite its potential risks;"  Pregnancy Category X means that "studies in animals or humans have demonstrated fetal abnormalities or if there is positive evidence of fetal risk based on adverse reaction reports from investigational or marketing experience, or both, and the risk of the use of the drug in a pregnant woman clearly outweighs any possible benefit . . . ." 21 C.F.R. § 201.57.

4

Prior to this, in 1994, GSK had submitted a supplemental NDA application for the use of Paxil to treat obsessive-compulsive disorder and panic disorder.  Dkt. ## 514-4, at 2; 555-3, at 2; 513-2, at 2.  In a memorandum dated October 20, 1995, the FDA stated that Paxil would be labeled Pregnancy Category C.  The FDA explained:

> As with other serotonin reuptake inhibitors, we find it necessary to request that the decreased survival of rat pups in reproduction toxicology studies receive more emphasis in labeling.  Because it is not clear whether this finding was related to effects of the drug on the developing fetus in utero or was secondary to postnatal drug effects on the dams and/or pups,[8] we have labeled PAXIL pregnancy category C.  If you were to conduct a cross-fostering study that clearly established that the adverse effect on pup survival occurred as a result of a postnatal effect rather than an in utero effect of drug on the fetus, the labeling may be changed from pregnancy category C to pregnancy category B.

Id. at 4.  An FDA reviewer's proposed changes to the label retained the language that "[t]hese [rat and rabbit studies] studies have revealed no evidence of teratogenic effects."  Dkt. # 512-13, at 5. The final approved label used this proposed language and listed Paxil as a Pregnancy Category C medication.  Dkt. # 513-2, at 22.  The FDA's approval letter, dated May 1996, also included the same language regarding use of the approved label and continuing obligations as in the original NDA approval letter from 1992.  Id. at 2-3.  Paxil was labeled Pregnancy Category C in 2005, when Jennifer Hayes allegedly took Paxil during her pregnancy with K.H.[9]  Dkt. ## 512, at 18; 555, at 8; 513-3, at 18.

---

[8]    GSK states that this "was unrelated to concerns about congenital heart defects," but provides no factual support for this assertion.  Dkt. # 627, at 12.

[9]    The parties disagree as to Jennifer's conception date.  The Hayeses argue that it was February 23, 2005, Dkt. # 555-3, at 6, while GSK argues it was March 23, 2005, Dkt. # 512, at 25.

In September 2005, GSK issued a "Dear Healthcare Professional" letter stating that it was "changing the Pregnancy subsection of the PRECAUTIONS section in the labels for PAXIL " Dkt. # 513-8, at 2.  The letter described the preliminary results of a GSK-sponsored retrospective study (the Ingenix study)[10], which "suggest[ed] an increase in the risk of congenital malformations associated with the use of paroxetine as compared with other antidepressants." Id.  The letter cautioned that inconsistencies among the Ingenix study, recent abstracts, and prior epidemiologic studies made "it difficult to conclude whether a causal relationship exists." Id.  Nonetheless, GSK stated it was "voluntarily adding this information to the paroxetine label." Id.  GSK also sent a letter to the FDA on August 22, 2005, reporting the preliminary results of the Ingenix study, as well as the results of two abstracts (Alwan et al. and Wogelius et al.) "reporting the results of epidemiological studies investigating the maternal use of SSRIs and the risk for birth defects." Dkt. # 514-7.  On September 6, 2005, GSK submitted a change to the "precautions section" of Paxil's label to reflect this information.  GSK retained Paxil's designation as a Pregnancy Category C drug in this change.  Dkt. # 514-8.

In December 2005, GSK issued another "Dear Healthcare Professional" letter stating that updated analyses from the Ingenix study and new data from another study utilizing a large medical birth registry "have now become available," and that GSK was revising the pregnancy precaution from Pregnancy Category C to Pregnancy Category D.  Dkt. # 513-10, at 2.  Paxil's label was changed to Pregnancy Category D in December 2005.  The revised label contained a section titled

---

[10]    The Ingenix study was designed to study major congenital malformations among offspring of women who took a different GSK antidepressant. Dkt. # 514-7, at 2.  Paxil was included among the comparator group of antidepressants.  Originally, results were not analyzed for the comparator drugs.  GSK later analyzed the Ingenix data for Paxil at the FDA's request. Id. at 3.

"Usage in Pregnancy: Teratogenic Effects," which described the results of various studies.  Dkt. ## 512, at 21; 513-12, at 11-12.  On December 8, 2005, the FDA issued a public health advisory which stated that "[a]t the FDA's request, the manufacturer has changed paroxetine's pregnancy category from C to D and added new data and recommendations to the <u>Warnings</u> section of paroxetine's prescribing information  . . . The FDA's conclusions and changes in paroxetine's prescribing information are based on preliminary analyses of two recent unpublished epidemiology studies." Dkt. # 513-13, at 2.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986); <u>Kendall v. Watkins</u>, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  <u>Celotex</u>, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" <u>Id.</u> at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,

586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 250.  In its review, the Court draws "all justifiable inferences," id. at 254, and construes the record in the light most favorable, Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998), to the party opposing summary judgment.

### III.

GSK seeks summary judgment on three grounds: first, GSK argues that the Hayeses' allegation that GSK's warnings were inadequate is preempted by federal law; second, GSK argues that there is no evidence it acted with the scienter required for punitive damages, or in the alternative, that Oklahoma's punitive damages statute is unconstitutional; and third, GSK argues that the testimony of the Hayeses' causation experts is inadmissible under Daubert, and without such testimony the Hayeses cannot establish an essential element of their claims for product liability and negligence.

A.    Preemption

GSK argues that it could not have included a stronger warning regarding the alleged potential teratogenic effects of Paxil on its label in 2005 because the FDA would not have approved it.  In Wyeth v. Levine, 129 S. Ct. 1187 (2009), the Supreme Court considered whether a plaintiff's claim of inadequate drug labeling was preempted because the FDA had deemed the label sufficient.  Id. at 1191, 1194.  The Supreme Court held that the inadequate warning claim was not preempted

because, "absent clear evidence that the FDA would not have approved a change to Phenergan's label, we will not conclude that it was impossible for Wyeth to comply with both federal and state requirements." Id. at 1198.

GSK argues that this is a case for preemption under Wyeth because there is "clear evidence" that the "FDA would not have approved a stronger warning based on the animal data."[11] Dkt. # 512, at 36. GSK asserts that that the FDA "required this language [that the animal studies revealed no evidence of teratogenic effects] in Paxil's labeling as a condition for approval." Id. at 35. However, GSK has provided no evidence that it attempted to strengthen the label's warnings about Paxil and pregnancy prior to September 2005. In Wyeth, the Supreme Court rejected the defendant's impossibility argument because it did "not argue that it attempted to give the kind of warning required by the Vermont jury but was prohibited from doing so by the FDA." 129 S. Ct. at 1198. The same is true here. Further, the events of September through December 2005 belie GSK's argument that the FDA would not have approved a label change. When GSK brought the preliminary results of the Ingenix and other studies to the FDA's attention, Paxil's label was changed. See Dkt. # 514-7; 513-13. The undisputed facts do not show that the FDA would have refused a stronger warning label for Paxil. Therefore, GSK is not entitled to summary judgment based on preemption.

---

[11]    GSK's focus on whether the FDA would have approved a label change based on the animal data alone is too narrow. The Hayeses do not argue that GSK should have known that Paxil's label was inadequate based on the animal data alone. The Hayeses also point to the Ingenix study, which used human data. Further, they argue that GSK should have recognized a potential teratogenic effect from spontaneous adverse incident reports. The fact that the current Category D label still states that the "animal studies revealed no teratogenic effects" does not show that the FDA would not have permitted stronger warnings based on human studies. In fact, it appears that human data prompted the change from Category C to Category D.

B.      <u>Punitive Damages</u>

GSK argues that the it is entitled to summary judgment on the Hayeses' claim for punitive

damages because the Hayeses cannot "prove that GSK acted recklessly or with conscious disregard

for the safety of others." Dkt. # 512, at 38.  However, GSK misstates the Hayeses' burden at this

stage of litigation.  To survive a motion for summary judgment, the Hayeses must show nothing

more than a genuine issue of material fact regarding entitlement to punitive damages.[12]  <u>See</u>

<u>Anderson</u>, 477 U.S. at 254; <u>see also</u> <u>Ames v. Brown</u>, No. 05-6389, 2006 WL 1875374, at *4 (10th

Cir. July 7, 2006) (unpublished) (listing material facts which "viewed collectively, raise triable

issues regarding whether Defendant  . . . may be liable for punitive damages").[13]

Oklahoma authorizes an award of punitive damages where, at a minimum, the "jury finds

by clear and convincing evidence that . . . [t]he defendant has been guilty of reckless disregard for

the rights of others . . . ."  OKLA. STAT. tit. 23, § 9.1(B).  There must be evidence "of reckless

---

[12]     GSK's suggestion that "[t]o survive a motion for summary judgment on punitive damages, Plaintiffs must offer 'clear and convincing' evidence showing that GSK acted with the necessary state of mind," is incorrect as a matter of law.  The plaintiff need not prove its case to survive a motion for summary judgment.  The case defendant cites, <u>Hamilton v. Amwar Petroleum Co.</u>, 769 P.2d 146 (Okla. 1989), does not support this proposition because punitive damages in that case were awarded after a full trial.  GSK's arguments regarding when the issue of punitive damages may be submitted to the jury would be more appropriately raised after the close of the Hayeses' evidence or the trial's conclusion.  <u>See</u> <u>Wirtz v. State Farm Mut. Auto Ins. Co.</u>, No.  CIV-08-1062-F, 2009 WL 2163617, at *8 (W.D. Okla. July 13, 2009) (denying defendant's motion for summary judgment on punitive damages because "any ruling on the issue of punitive damages should be made after the court has had an opportunity to hear all of the evidence offered in support of plaintiff's claim).

[13]     Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

10

disregard toward another's rights from which malice and evil intent may be inferred." <u>Badillo v. Mid Century Ins. Co.</u>, 121 P.3d 1080, 1106 (Okla. 2005).

Viewing the record in the light most favorable to the non-moving party, the Court finds that the Hayeses have shown triable issues regarding their entitlement to punitive damages. The Hayeses have provided evidence from which a jury could find that in 1993 and 1994, GSK deliberately avoided doing reproductive toxicology studies for Japanese regulators because the studies could provide potentially damaging results for labeling in the United States. <u>See</u> Dkt. ## 556-10, at 2; 556-11, at 3; 556-13, at 5. They have also provided evidence from which a jury could find that GSK wanted to make sure that the Ingenix study would not look specifically at Paxil. Dkt. # 557-26, at 3. GSK later analyzed the Ingenix data with respect to Paxil at the FDA's request. <u>See</u> Dkt. # 627, at 30. This analysis contributed to the label change from Pregnancy Category C to D. Dkt. ## 513-13, at 2; 627, at 30. Drawing all reasonable inferences in the Hayeses' favor, a jury could find that GSK acted with reckless disregard for the alleged risks of Paxil by refusing to perform studies which could have revealed potential teratogenic effects.

GSK also argues that Oklahoma's punitive damages statute is unconstitutional. As more fully explained in this Court's Opinion and Order denying two of GSK's motions <u>in limine</u> regarding punitive damages evidence (Dkt. # 646), a ruling on the constitutionality of Oklahoma's punitive damages statute would be premature. The issue of punitive damages will not be before the Court unless a jury finds, after the first phase of trial, that GSK acted with the requisite culpability to trigger a second phase wherein punitive damages would be considered. Therefore, the portion of GSK's motion that requests summary judgment on the Hayeses' claims for punitive damages is denied.

C.      <u>Daubert motions</u>

GSK argues that the testimony of the Hayeses' causation experts is inadmissible under <u>Daubert</u>.  Without these experts, GSK argues, the Hayeses cannot establish causation, which is an essential element of their remaining claims.  GSK's <u>Daubert</u> motions concerning the Hayeses' causation experts (Dkt. ## 356, 359) are currently pending before Magistrate Judge Wilson. Therefore, the Court takes this portion of GSK's motion for summary judgment under advisement.

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (Dkt. # 512) is **denied in part** and **taken under advisement in part**: it is denied as to defendants' arguments regarding preemption and punitive damages; it is taken under advisement as to defendants' argument regarding its <u>Daubert</u> motions.


**DATED** this 14th day of December, 2009.


CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT